Ted Bates & Company, Inc. v. Commissioner.
Ted Bates & Co. v. Commissioner
Docket Nos. 3429-62, 1215-64.
United States Tax Court
T.C. Memo 1965-251; 1965 Tax Ct. Memo LEXIS 78; 24 T.C.M. (CCH) 1346; T.C.M. (RIA) 65251; September 17, 1965
Richard S. Greenlee, John J. Hayes, Arthur Pelikow, and William F. O'Connor, for the petitioner. Claude R. Wilson, Jr., and William J. Luff, Jr., for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent, pursuant to statutory notices of deficiency, *81 determined the following deficiencies in petitioner's income tax for its fiscal years 1957 through 1961: Fiscal Year
Deficiency per
ended March 31
Statutory Notice
1957
$799,383.67
1958
980,191.58
1959
856,684.28
1960
$674,475.04
1961
487,948.60
Total
$3,798,683.17
By way of amended answer, respondent asserted additional deficiencies of $77,000 for each of petitioner's fiscal years 1957 and 1958. The sole issue remaining for decision is whether petitioner, Ted Bates & Company, Inc., is subject to the accumulated earnings tax under section 531[1] with respect to all, or any part, of the earnings retained by it during the years herein involved. [2]
Findings of Fact Some of the facts have been stipulated, and the stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Ted Bates & Company, Inc., (hereinafter referred to as petitioner) is a corporation *82 organized under the laws of the State of New York. It maintains its books of account and files its Federal income tax returns on the basis of an accrual method of accounting and a fiscal year ended March 31. It timely filed its Federal income tax returns for its fiscal years ended March 31, 1957 through 1961, inclusive with the district director of internal revenue, Manhattan District, New York, New York (formerly the Upper Manhattan District). Petitioner is a large advertising agency. Petitioner's Early History and Background Petitioner is the successor to (1) Ted Bates and Company, a limited partnership organized under New York law on December 1, 1948, and dissolved on March 31, 1955, (hereinafter referred to as the partnership) and (2) the partnership's predecessor, Ted Bates, Incorporated, a New York corporation formed on October 18, 1940, and liquidated on November 30, 1948 (hereinafter sometimes referred to as the original corporation). Petitioner takes its name from the founder of the agency, Theodore L. Bates (hereinafter referred to as Ted Bates or Bates). Ted Bates has been connected with the advertising business since his graduation from Yale College in 1924, *83 at which time he went to work for the Chase National Bank in its advertising department. From 1935 to 1940 Bates worked for various advertising agencies. In 1940 he formed his own advertising agency by organizing Ted Bates, Incorporated, in October of that year. During the period of its existence, the original corporation had elected to be taxed as a personal service corporation under sections 391 through 396 of the Internal Revenue Code of 1939. In 1947 some question arose with regard to whether it could properly qualify as a personal service corporation. It was decided that the original corporation would be liquidated and its business would be continued in the form of a partnership. On December 1, 1948, the partnership, Ted Bates & Company, was formed to take over the business of the original corporation. The partnership was launched with a formal capital consisting of $200,000 cash. The partners consisted of Bates, who had a 56 percent interest therein, his wife, with a 10 percent interest, and various other individuals who had formerly been employed by the original corporation. Included in this group were T. Rosser Reeves and William H. Kearns, each of whom had a 5 percent *84 interest. Through the efforts of Bates and his associates, the agency prospered and grew at a rapid rate. In 1948, it was ranked as the nineteenth largest advertising agency in the United States. By 1954 it was the eleventh largest advertising agency in the country, with gross billings to clients in excess of $46,000,000. As the business expanded, the partners became increasingly aware of the fact that partnership form was not an appropriate vehicle through which to conduct their business. Several of the managing partners, principally Bates, Reeves, and Kearns, began, at some point during 1953, to considerseriously the possibility of incorporation as a means to avoid the difficulties caused by operating the agency as a partnership. As a partnership, the business was unable (1) to build up sufficient working capital to finance its day-to-day operations and (2) to accumulate funds to be used, or invested, for expansion. Moreover, the agency had outgrown its quarters at 630 Fifth Avenue. In searching for suitable offices into which to move, the partners soon realized that the rent commitments were going to be extremely high. In tentative discussions with the lessor of the premises *85 into which the agency ultimately moved, the partners were told that the rental commitment for the term of the lease, namely 20 years, would be approximately $12,000,000. Facing a potential liability for rent in so large an amount, the partners became convinced that it was necessary to incorporate their business. Furthermore, partnership form did not provide a practical or suitable means for offering equity participation to "key" employees. The other large agencies with which the partnership competed were corporations which offered stock options to "key" employees. Therefore, the partnership believed itself to be at a distinct disadvantage with its competitors from the standpoint of attracting and retaining highcaliber personnel. For these reasons petitioner was incorporated on February 24, 1955, to take over the advertising business theretofore conducted by the partnership. The partnership was dissolved on March 31, 1955. At the time of its organization, petitioner had an authorized capital stock consisting of 150,000 shares of Class A stock with a par value of $5 per share and 150,000 shares of Class B stock with a par value of $0.10 per share. The members of the partnership *86 transferred their respective interests in the partnership assets to petitioner and in return were issued shares of stock in petitioner in the following amounts: Shares of
Stock Received
Name of Partner
Class A
Class B
Theodore L. Bates
30,000
150,000
Thomas F. Harrington
10,000
T. Rosser Reeves
10,000
William H. Kearns
10,000
Evelyn T. Bates
5,000
D. Robert Parman
5,000
Clifford N. Parsells
5,000
Rudolph Montgelas
3,000
John M. Lyden
2,500
Clinton S. Ferris
2,500
Alman J. Taranton
2,500
Thomas J. Carnese
1,500
Edgar P. Small
1,000
Total
88,000
150,000
In addition to the above shares of stock, petitioner shortly after its incorporation sold at a price of $5 per share a total of 9,500 shares of Class A stock to various other key employees. Thus, as of April 1, 1955, petitioner had 97,500 shares of Class A stock and 150,000 shares of Class B stock issued and outstanding and had paid-in capital of $502,500. The Class B stock was limited to $0.10 per share in current dividends, non-cumulative, and to $0.10 per share upon liquidation. There were no limitations as to current or liquidating dividends on the Class A stock. *87 In order to supplement its paid-in capital and to provide sufficient funds to allow it to commence operations, petitioner borrowed $600,000 from The Chase Manhattan Bank and an additional $600,000 from Ted Bates. Petitioner's Earnings and Distributions of Dividends For its fiscal years 1956 through 1964, petitioner had taxable income and paid dividends in the following amounts: Net Income
Percentage of Net
Fiscal Year
(Taxable Income
Income After
Ended
Less Income
Dividends
Taxes Distributed
March 31
Taxes Paid)
Distributed
as Dividends
1956
$1,363,568.29
$
1957
1,935,626.08
180,600
9
1958
2,338,086.75
220,300
9
1959
2,009,175.18
325,800
16
1960
2,102,870.30
442,975
21
1961
1,559,343.53
442,250
28
1962
1,617,507.57
497,175
31
1963
1,344,416.57
508,419
38
1964
1,959,102.41
665,538
34
During petitioner's fiscal years 1956 through 1961, its accumulated earned surplus account, annual retained earnings, capital stock account, and net worth were as follows: Total
Amount
Capital
Fiscal Year
Accumulated
of Earnings
Stock and
Net Worth
Ended
Earned
Retained
Paid-In
(Capital Stock
March 31
Surplus
Per Year
Surplus
and Surplus)
1956
$1,344,208.93
$1,344,208.93
$530,180.00
$1,874,388.93
1957
3,079,685.52
1,755,026.08
660,720.00
3,740,405.52
1958
5,182,059.39
2,117,786.75
657,465.00
5,839,524.39
1959
6,750,599.94
1,683,375.18
817,341.00
7,567,940.94
1960
6,636,630.42
1,659,895.30
963,093.00
7,599,723.42
1961
7,714,326.23
1,117,093.53
951,583.00
8,665,909.23
*88 Petitioner's Growth and Expansion Since Incorporation Petitioner's rate of growth since its incorporation has been even more marked than that of its predecessors, the original corporation and the partnership. Thus, the number of persons employed by petitioner more than doubled during the taxable years in issue herein, as is reflected in the following schedule: Number of
Regular
As of
Employees
April 1, 1955
450
March 31, 1956
532
March 31, 1957
669
March 31, 1958
761
March 31, 1959
802
March 31, 1960
936
March 31, 1961
1,048
From the time of its incorporation through the close of its fiscal year ended March 31, 1964, petitioner's gross billings to clients more than doubled, increasing from approximately $61,000,000 for its fiscal year ended March 31, 1956, to more than $153,000,000 for its fiscal year ended March 31, 1964. The following schedule illustrates the rapidity and extent of the increase in petitioner's operations by setting forth pertinent items of petitioner's receipts and expenditures from April 1, 1955, through March 31, 1964. Taxpayer's
Operating
Taxpayer's
Expenses (Excl.
Payments to
of Payments
Taxpayer's
Fiscal Year
Gross
Advertising
to Adv. Media
Payment
Ended
Billings
Media, Talent
Etc. & Fed.
of Fed.
March 31
to Clients
Suppliers, Etc.
Inc. Taxes)
Income Tax
1956
$ 61,553,200.00
$ 52,441,600.00
$ 6,288,313.00
$1,465,740.64
1957
84,070,200.00
71,590,300.00
8,483,449.00
2,085,469.91
1958
102,807,600.00
87,733,100.00
10,275,395.00
2,519,799.06
1959
109,543,000.00
93,489,900.00
11,918,010.00
2,160,621.75
1960
124,966,500.00
106,698,200.00
14,017,839.00
2,266,601.38
1961
132,773,800.00
113,403,300.00
15,995,585.00
1,677,830.50
1962
144,415,900.00
123,477,900.00
17,426,774.00
1,738,321.37
1963
139,119,300.00
118,949,600.00
17,295,412.00
1,442,355.61
1964
153,495,400.00
131,013,900.00
18,400,874.00
2,050,409.98
*89 Another factor indicating petitioner's significant expansion during the period in issue is that during those years its accounts receivable from clients and its billable production orders in process nearly tripled. The significant increase in those items is illustrated by the following table: Taxable Year
Ended
Accounts Receivable
Billable Orders
March 31
from Clients
in Process
Total
1956
$ 4,925,926.00
$ 272,325.00
$ 5,198,251.00
1957
8,506,844.00
995,566.00
9,502,410.00
1958
8,885,498.00
876,260.00
9,761,758.00
1959
9,367,326.05
705,319.72
10,072,645.77
1960
11,941,822.41
509,693.22
12,451,515.63
1961
14,551,232.81
441,140.68
14,992,373.49
1962
14,662,861.00
504,452.00
15,167,313.00
1963
14,145,135.00
1,181,415.00
15,326,550.00
1964
14,095,698.00
819,348.00
14,915,046.00
Between 1948 and 1961, the gross billings of petitioner and its predecessors increased by 733.3 percent compared to an average increase of 226.3 percent for the nine largest advertising agencies (excluding petitioner) in the United States. As a result of its growth, petitioner advanced from the eleventh largest agency in the country in 1954 to the *90 fifth largest agency by 1958, which position it retained through the close of the last taxable year in issue herein. As petitioner's business expanded, its management became increasingly convinced that it would need to retain significant portions of its earnings in order to conduct its day-to-day operations and to finance plans for expansion. In attempting to determine the amount of earnings to be retained for working capital purposes, petitioner's management was, to a large extent, influenced by various "rule of thumb" standards prescribed by trade associations such as Periodical Publishers Association and the American Association of Advertising Agencies. Moreover, in considering the needs of petitioner's business, its management did not attempt to assign a specific dollar amount to the various business needs confronting the agency. However, management did consider and, in fact, based its estimates upon petitioner's actual business needs. Petitioner's Business Needs During the Years in Issue (1) Funds Needed to Finance Slow-Paying Clients Petitioner is a general advertising agency in that it works for a group of clients and prepares their advertising in all its forms. It *91 specializes, however, in a particular kind of accounts, referred to in the trade as the "package goods business." Included in this general description are items such as various food products, cigarettes, toilet articles, and proprietary medicine products. Petitioner's income is generated by the collection of commissions from the various media, i.e., television, magazines, newspapers, radio, etc., with which it places advertisements on behalf of its clients. The standard commission, for the most part, is 15 percent of the amount billed the client. It is the custom in the advertising business for the media and suppliers to bill the agency for the time, space, production, talent, art, and mechanical charges involved in the client's advertising campaign. There are three reasons why these charges must be paid by the advertising agency as of the date specified in the bill from the media. First, there is a contract which so provides. Second, media, other than television, allow a 2 percent cash discount for prompt payment of bills. The contracts between an advertising agency and its clients provide that the agency must pay all bills in sufficient time for the client to receive the benefit *92 of the available discount, whether or not the agency has received payment from the client. Finally, the advertising agency's credit rating, which is of the utmost importance in that business, is dependent upon its prompt payment of bills. Despite various trade association admonitions against advertising agencies extending short-term financing to clients, petitioner, through no fault of its own, found itself during each of its taxable years in issue financing some of its clients in the payment of their media charges. This came about because some of its clients would, for one reason or another, delay in paying their media billings. All of petitioner's clients during the period in issue were large, profitable concerns with excellent credit ratings. Nevertheless, petitioner experienced, during each of its taxable years in issue, a time lag between (1) the dates that it would pay the media and suppliers' charges for certain of its clients and (2) the time the clients would reimburse it. This produced net arrearages which generally averaged in excess of $1,000,000, and at some points during 1959 and 1960, were as high as $1,800,000. Thus, to the extent that clients were late in paying their *93 bills during the years in issue, petitioner was required to invest from $1,000,000 to $1,800,000 of its working capital in the receivables of clients. (2) Reserves to Cover Certain Fixed Obligations and Commitments in the Event of Temporary Losses of Revenues A second consideration which entered into management's decision to retain a major portion of petitioner's earnings during the years in issue was to provide a suitable reserve to cover certain of petitioner's obligations or liabilities in the event of a temporary loss in its operating revenues. Since the time of its incorporation, petitioner has incurred an increasing number of obligations which it regards as fixed and long-term commitments. Included in this category is its lease on the premises it occupies at 666 Fifth Avenue, New York. Thus, as of May 1, 1957, when the term of the lease commenced, petitioner was obligated to pay an annual rental of $829,000 and its rent liability for the entire term of the lease, 20 years, was in excess of $16,500,000. Petitioner was given the option to terminate the lease only after the expiration of 15 years of the 20-year term upon the payment by it of $257,512 to the lessor. Under New *94 York law, a tenant is liable for the total rent for the entire term of the lease, and the lessor is under no obligation to mitigate the amount due by attempting to lease the premises. Petitioner's management tended to regard the salaries and other emoluments paid to employees (other than top management) in the nature of fixed obligations. Petitioner, as well as its predecessors, steadfastly followed a policy of keeping its staff intact at all costs. It would not release employees who had worked on accounts which the agency might lose, even though such losses might be accompanied by a temporary slack in workload and employee productivity. In 1962 petitioner lost three clients, which had accounted for gross billings of more than $3,400,000. It retained the entire staff which serviced those accounts although there was a temporary slack in the workload. Salaries and fees and other such expenses incurred on behalf of personnel during petitioner's taxable years in issue absorbed the largest part of its operating income. These amounts are reflected in the following table: SALARIES FEES, AND OTHER AMOUNTS PAID TO OR ON BEHALF OF EMPLOYEES Fiscal Year Ended March 31,
1956
1957
1958
Compensation of
$1,586,757.83
$2,105,759.47
$2,330,370.85
officers
Salaries and wages
3,139,625.16
3,709,078.26
4,564,017.61
to employees other
than officers
Contributions to
603,450.57
764,271.47
employee
profit-sharing
plan
Contributions to
other employee
benefit plans
Total
$4,726,382.99
$6,418,288.30
$7,658,659.93
*95 Fiscal Year Ended March 31,
1959
1960
1961
1962
Compensation of
$2,679,911.99
$ 3,538,412.95
$ 4,167,720.09
$ 4,244,741.76
officers
Salaries and wages
5,089,278.89
5,647,522.13
6,631,762.34
7,260,648.60
to employees other
than officers
Contributions to
917,983.32
1,038,606.12
1,312,027.23
1,718,012.60
employee
profit-sharing
plan
Contributions to
108,840.93
175,987.69
other employee
benefit plans
Total
$8,687,174.20
$10,224,541.20
$12,220,350.59
$13,399,390.65
Although petitioner experienced no difficulty in paying salary expenses from its urrent earnings during the years in issue, its management believed that, in view of the concentration of the major portion of its business among a relatively small number of clients, it would be prudent to establish some sort of reserve to enable it to "weather" any temporary loss of billings. For its fiscal years ended March 31, 1957 through 1961, inclusive, petitioner serviced the following number of clients: Fiscal Year
Ended
Number of
March 31
Clients
1957
12
1958
13
1959
13
1960
17
1961
19
During the taxable years in issue herein, almost *96 60 percent of petitioner's total billings came from its three largest clients. The combined billings of its five largest clients represented more than 70 percent of its total billings during each of the years before us. The following schedule reflects the amount and percentage of petitioner's total billings accounted for by its five largest clients during its fiscal years 1957 through 1961: Percent of Total
Fiscal
Billings Accounted
Year Ended
for by its 5
March 31
Largest Clients
1957
73.5
1958
77.3
1959
77.1
1960
76.1
1961
73.1
During the period in issue, petitioner's two largest clients accounted for the following percentages of petitioner's total annual gross billings: Percent of Total
Fiscal
Billings Accounted
Year Ended
for by its 2
March 31
Largest Clients
1957
42.0
1958
44.0
1959
41.9
1960
43.4
1961
41.6
Petitioner's operating income during the taxable years in issue have been reduced by between $3,000,000 and $4,000,000 had it lost either of its two largest clients. Although neither petitioner nor its predecessors has ever experienced the loss of one of its more significant and substantial accounts, *97 the evidence before us indicates that turnover and loss of clients, or particular accounts, are not unexpected occurrences in the advertising business. The nature of the advertising business is highly unpredictable in so far as the permanency of relations between client and agency are concerned and the fact that a client has given its work to a particular agency for a number of years is no guarantee that the client will continue to do so. Another hazard akin to the loss of a client, which petitioner has faced and experienced, is the reduction by an established client of its advertising budget. Budget cuts by clients would occur generally if the client's sales did not materialize as anticipated. Such budget reductions would generally be announced to petitioner without notice. They would often occur late in the year after petitioner had undertaken substantial expenses in the development of a particular advertising campaign. Petitioner would never be directly recompensed for these expenses. It has experienced budget cuts as large as $5,000,000 in gross billings by one client. (3) Reserves for Deductible Items Petitioner's costs incurred in connection with promoting new business *98 approximately $700,000 to $1,500,000 per year during the period in issue. These costs never exceeded 6 percent of operating income and were consistently treated as expenses offsetting income. (4) Foreign Expansion From the time of its incorporation, petitioner experienced spiraling costs and a decreasing profit margin. For a number of reasons the members of petitioner's management became convinced at an early date that continued growth and expansion were necessary for its survival in the advertising business. They also realized that domestic growth alone would not be enough, but that it would be necessary for petitioner to expand its operations abroad. The one single factor that served as a catalyst in kindling their interest in expansion abroad was that one of petitioner's new clients, Mars Enterprises (which was also one of the largest advertisers in England), stated to petitioner during 1955 "it might be beneficial to both petitioner and the client if petitioner could begin to conduct operations in England." In June of 1955, T. Rosser Reeves participated in preliminary discussions in London with the head of Masius & Ferguson, the advertising agency which handled the Mars advertising *99 in England, concerning the development of some kind of working arrangement between petitioner and the British agency. While in London, Reeves visited other British advertising agencies in order to obtain some background with regard to the possible terms on which a British agency might be acquired. Upon various occasions during the next two years, petitioner was called upon by its client, Mars Enterprises, to impart to various members of the Masius & Ferguson agency some of its "know-how" and techniques in "spot" television commercials and the Bates' philosophy of "U.S.P." or "Unique Selling Proposal," a form of the extremely "hard sell." Petitioner was also, upon occasion, requested by this client to assist the Masius & Ferguson agency in the creation of advertisements for use in Great Britain. Petitioner found itself in a predicament where it was actually doing work for its client in England, but it could not receive compensation therefor. Moreover, petitioner believed that it was placed in a position where it was imparting its "knowhow" and advertising techniques to an advertising agency handling the advertising of one of petitioner's clients and that it was actually aiding a potential *100 competitor. Bates, Reeves, and Kearns believed that in order to extricate petitioner from this predicament it was essential for it to acquire some kind of foothold in England. At this time, other considerations, aside from direct client pressure, began to convince petitioner's management that expansion abroad was imperative and should be effected as quickly as possible. On March 25, 1957, the Treaty of Rome was signed, and the European Economic Community, more commonly known as the European Common Market, was formed. Some of petitioner's clients were among the host of United States concerns which increased their business activities in Europe. Petitioner realized that its clients would require advertising services in Europe. It also realized that six agencies of the other 10 or 15 largest advertising agencies in this country had, as of 1955, acquired one or more offices in foreign countries where petitioner's clients conducted substantial operations. Petitioner believed that in order to retain these clients it had to offer them a full line of services, including handling their advertising abroad. Petitioner's plans to expand abroad began to crystallize toward the end of its fiscal *101 year in 1957. Thus, during January and February of 1957 Bates, Reeves, and Kearns discussed petitioner's chances of acquiring the Masius & Ferguson agency. Most of the discussions concerning foreign expansion took place at informal meetings between Bates, Reeves, and Kearns, rather than at formal meetings of the executive committee or the board of directors. They discussed the amount of money that might be needed to purchase the British agency and agreed that it would probably cost approximately $1,500,000. Reeves was sent to London to determine whether Masius & Ferguson was for sale. In the spring of 1957 (the beginning of petitioner's fiscal year 1958) Reeves went to England to discuss with the principals of the Masius & Ferguson agency a possible sales price. One of the owners of that agency described the situation as follows: But by 1956 or 1957 we began to * * * feel the hot breath of Bates on the back of our necks. We realized that they were interested to come in and that they had support from at least one of our bigger clients. Somewhere around 1957 negotiations started which continued over a long period. We were not anxious to deal in 1957 for a variety of reasons, some *102 of which were personal * * *. In 1958 we got down to very serious discussions. The first figure mentioned by the Masius & Ferguson people was $4,000,000. Reeves suggested that petitioner might be willing to purchase Masius & Ferguson at five times earnings. The Masius & Ferguson people indicated that their earnings were approximately $300,000 per year; that they would not be willing to sell for $1,500,000; and that higher earnings were anticipated the next year. They suggested the negotiations be suspended for one year. In June 1958, Reeves was once again dispatched to London to resume negotiations concerning the purchase of the Masius & Ferguson agency. The discussions lasted for approximately ten days. Reeves, who was then chairman of petitioner's board of directors, reached a tentative agreement with the Masius & Ferguson people, at least to the extent that certain rough limits were drawn. It was agreed that the transaction would be finalized in New York during the fall of 1958. While in London, Reeves discovered that the John Hobson and Partners, Ltd., advertising agency might be available for purchase. He visited that agency to acquaint himself with the personnel there and *103 the nature of the agency's operations. Upon returning to New York, he reported this development to the other members of petitioner's management. Several weeks later Reeves wrote a letter to John Hobson inquiring whether Hobson would consider selling the agency to petitioner. At the same time petitioner was negotiating for the acquisition of a subsidiary in England, it was also making plans for additional foreign expansion. During the summer of 1958 petitioner sent one of its senior vice-presidents to Europe to prepare a survey of the European market. Petitioner, during the latter part of 1958, also authorized the same officer "to explore specific possibilities for expansion into Canada." In the fall of 1958, the two principal owners of the Masius & Ferguson agency came to New York to meet with the four "top" members of petitioner's management. When the negotiations seemed about to be finalized at a price of $2,000,000, it was disclosed that a London bank had some kind of interest in the agency. It was decided that Reeves would go to London in January of 1959 to deal directly with the bank. When the nature of the Masius & Ferguson obligation to the bank was explained to Reeves, *104 he decided that the over-all cost to petitioner would be too high. The negotiations were then terminated. The next day Reeves contacted the John Hobson and Partners, Ltd., agency to discuss the purchase thereof. It was tentatively agreed that petitioner would acquire that agency for approximately $600,000. In May 1959 the owners came to New York to finalize the agreement. As the negotiations progressed, the sales price increased. Ultimately, it was agreed that petitioner would purchase the Hobson agency for the price of $1,019,000. In addition, petitioner agreed that, because the working capital of the Hobson agency was depleted, petitioner would guarantee a line of credit to that agency of $650,000. The sale was closed on July 7, 1959. On that same date petitioner pledged $650,000 in notes of the State of New York to establish overdraft facilities in the amount of 200,000 pounds (U.K.) in favor of the Hobson agency. In May 1959 petitioner conducted talks with representatives of the Canadian advertising agency, Spitzer & Mills, Ltd. Negotiations with the Canadian agency continued during the ensuing seven months and reached a point where a price was agreed upon. On January 12, 1960, petitioner *105 authorized two of its officers to acquire the Canadian agency for a price of $850,000 (in Canadian currency), with $700,000 to be paid at the closing, and the remaining $150,000 to be paid in three annual installments of $50,000. An agreement with the Canadian agency on the above terms was reached on January 14, 1960, and was reduced to writing and embodied in a contract dated August 23, 1960. Petitioner actually acquired the Canadian advertising agency on September 20, 1960. On October 28, 1960, petitioner advanced $200,000 to its Canadian subsidiary to provide it with sufficient working capital. In return therefor, it received a two-year promissory note. The note was extended to October 28, 1964, on which date it was paid. On December 30, 1960, petitioner paid an additional $36,678.67 in accordance with the contract of purchase. After approximately 2 1/2 years of negotiations, petitioner on November 30, 1961, acquired a French advertising agency, 1'Agence Francaise de Propagande, at an aggregate cost of $666,955. Of that amount, $638,066 was paid on November 30, 1961, and the balance on February 28, 1963. To provide the French agency with sufficient working capital, petitioner *106 advanced $150,000 to that agency on January 24, 1962. After long and exhaustive studies were conducted by petitioner with regard to the best way to establish itself in Germany, it was decided that its Canadian subsidiary would establish an advertising agency in West Germany without any direct investment therein by petitioner. This was done on June 8, 1962. Petitioner formed an Italian advertising subsidiary on September 2, 1963. As of November 20, 1963, its capital investment [equity] therein was $48,930. In addition, it loaned the subsidiary $50,000 on November 14, 1963, and an additional $150,000 on March 6, 1964. Pursuant to a contract dated March 11, 1964, petitioner acquired an Australian advertising agency at an aggregate cost in excess of $1,750,000. To provide this subsidiary with sufficient working capital, petitioner on August 21, 1964, loaned it $250,000 by pledging New York State Bond Anticipation Notes in a like amount with The Chase Manhattan Bank as collateral for overdraft facilities for the subsidiary. Pursuant to a contract dated September 1, 1964, petitioner acquired all of the stock in a Belgian advertising agency for the purchase price of $100,000. *107 Between July 7, 1959, and September 1, 1964, petitioner, through purchases of stock and loans, invested funds totaling approximately $5,900,000 in foreign subsidiaries. (5) Stock Redemptions by Petitioner Despite the fact that petitioner during the first four years of its corporate existence followed a liberal policy of granting stock options to employees of ability, control of petitioner remained in the hands of Ted Bates. Thus, immediately prior to March 1960, the outstanding stock in petitioner was owned as follows: Class A
Class B
Shares
Shares
Bates
30,000
150,000
Reeves
10,000
Kearns
10,000
[1] Montgelas 3,500
Bates' wife
5,000
Other Employees
48,050
Total
106,550
150,000
As petitioner grew and expanded this concentration of its stock ownership in Bates (a 70.2 percent voting interest) began to pose more and more of a problem to it. One aspect of the problem was the threat to its financial stability which might occur if it were called upon to redeem the Class A stock held by Bates in the event of his death. Under a stock redemption *108 agreement which petitioner had entered into with Bates at the time of its incorporation, petitioner was obligated to redeem Bates' stock from his estate, in the event of his death, if the estate were to so elect. Another problem presented by the concentration of stock ownership in Bates was that the other members of petitioner's top management were not sufficiently "tied to" petitioner by way of stock ownership to assure that they would remain with petitioner and not seek "greener pastures." In the course of petitioner's expansion, three of its officers, Reeves, Kearns, and Montgelas, assumed an increasing share of the high policy making management functions in petitioner. Moreover, as the business grew, these three individuals began to assume the responsibility of maintaining a close relationship with an increasing number of petitioner's clients. Thus, by mid-1959, four persons, namely Bates, Reeves, Kearns, and Montgelas, on a more or less roughly equivalent basis, divided among themselves the responsibility of maintaining or overseeing that good relations were maintained between petitioner and its clients. These four individuals, in effect, shared the top management responsibilities *109 in running petitioner's affairs and planning for its future. In view of this development, it became apparent to Bates that the continued services and loyalty of Reeves, Kearns, and Montgelas were essential to petitioner's successful operation and growth. Petitioner's financial advisers from time to time pointed out to petitioner that in order to retain and encourage these three officers it would be necessary to increase their stock ownership in petitioner. Bates, Reeves, Kearns, and Montgelas discussed the subject among themselves upon several occasions during 1959. It was agreed that the stock ownership in petitioner would be rearranged to the end that each of them would own roughly equivalent interests therein. Because neither Reeves, Kearns, nor Montgelas possessed sufficient capital to purchase a portion of Bates' stock, it was decided (1) that petitioner would redeem 20,000 shares of the Class A stock held by Bates and (2) that from his 150,000 shares of Class B of $0.10 per share par value stock Bates would sell 37,500 shares of such stock apiece to Reeves, Kearns, and Montgelas at $0.10 per share. Pursuant to the terms of the stock option agreement governing petitioner's repurchase *110 of stock from shareholders, 20,000 shares of Bates' Class A stock were to be acquired at the book value of the stock as shown on the petitioner's books at the close of the month preceding the date of tender. No consideration was to be given for petitioner's goodwill. From a personal standpoint, Bates did not want to surrender any portion of his stock in petitioner. However, in deference to what he believed to be the better interest of petitioner, Bates agreed to the redemption. The details of the above-described realignment of stock ownership in petitioner were worked out by its lawyers and accountants. Petitioner's accountants by letter dated November 20, 1959, requested a ruling from respondent to the effect that petitioner's purchase of the 20,000 shares of Class A stock from Bates, together with his sale of a total of 112,500 shares of his Class B stock to Reeves, Kearns, and Montgelas, would constitute a substantially disproportionate redemption within the meaning of section 302(b)(2). Respondent issued a favorable ruling on March 18, 1960. Subsequent to the receipt of this ruling, the transaction was effected as described in the ruling request. Thus, petitioner purchased *111 20,000 shares of Class A stock from Bates for an aggregate consideration of $1,800,400. Bates sold to Reeves, Kearns, and Montgelas each 37,500 shares of his Class B common stock at the price of $0.10 per share. Thereafter the stock ownership and voting control in petitioner were distributed as follows: Holdings of Class A and Class B Common
Stock in Petitioner after
March 31, 1960
Combined
Voting
Class A
Class B
[2] Power [1] Shares [1] Shares (Percent)
Bates
10,000
37,500
20.1
Reeves
10,000
37,500
20.1
Kearns
10,000
37,500
20.1
[3] Montgelas 3,500
37,500
17.3
Bates' wife
5,000
2.1
Other Employees
48,050
20.3
Total
86,550
150,000
100.0
Analysis of Petitioner's Liquid Position Petitioner's current assets, current liabilities, and working capital as of the close of its fiscal years 1956 through 1961 were as follows: F. Y. Ended
Current
Current
Working
March 31
Assets
Liabilities
Capital
1956
$ 8,902,273.77
$ 7,393,270.24
$1,509,003.53
1957
15,408,044.84
12,183,684.47
3,224,360.37
1958
17,324,109.85
12,552,690.87
4,771,418.96
1959
20,894,066.83
14,386,754.11
6,507,312.32
1960
18,151,442.95
13,344,584.87
4,806,858.08
1961
19,582,721.90
14,506,773.16
5,075,948.74
*112 During its fiscal years 1957 through 1961, petitioner's minimum bank balances and minimum securities investments were as follows: Minimum
Minimum
F. Y. Ended
Bank
Securities
March 31
Balance
[1] Investment 1957
$2,990,137.16
$ 992,827.75
1958
4,054,502.64
1,586,176.88
1959
4,100,331.54
493,828.13
1960
3,694,582.95
2,648,884.37
1961
3,032,284.71
650,162.01
Respondent, in accordance with section 534(b), sent petitioner two notifications (the first notification with regard to petitioner's fiscal years 1957 and 1958 and the second with regard to its fiscal years 1959, 1960, and 1961) indicating that he intended to issue a deficiency notice for the years 1957, 1958, 1959, 1960, and 1961 based upon section 531. Petitioner thereafter submitted timely statements in detail pursuant to section 534(c) setting forth the grounds upon which it relies to establish that its retained earnings for the years in issue were not permitted to accumulate beyond the reasonable needs of its business. Opinion Respondent determined deficiencies in petitioner's income tax for its fiscal years ended March 31, 1957 through 1961, based on section 531. [3] The ultimate issue for decision is whether petitioner was formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits during any of the above years to accumulate beyond the reasonable needs of the business instead of being divided or distributed. Section 532. Under the present statutory provisions dealing with the accumulated earnings tax, unless petitioner can prove to the contrary by a preponderance of the evidence, the very fact that its earnings and profits were permitted to accumulate beyond the reasonable needs of its business is determinative of this forbidden purpose. Section 533. However, to the extent petitioner can establish that it retained all or any part of its earnings and profits to meet the reasonable needs of its business, such amount will be allowed as a credit against its accumulated taxable income [4] subject to the accumulated earnings tax. Section 535 (c). Thus, it will be necessary for us to consider whether petitioner's earnings and profits were, in any of the years herein concerned, accumulated beyond the reasonable needs of its business. If the answer to this issue is in the affirmative, we must determine for each year in question what part of petitioner's earnings, if any, has been retained for the reasonable needs of its business [5] so as to permit the computation of the credit allowed by section 535(c). Motor Fuel Carriers, Inc. v. United States, 322 F. 2d 576 (C.A. 5, 1963). *113 *114 As a result of its policy to retain a major portion of its earnings, petitioner, during its taxable years in issue, was in an extremely liquid position. This high degree of liquidity, coupled with the relatively large amount of petitioner's accumulated earnings during the years in issue, is evidently what prompted respondent to question the reasonableness of petitioner's accumulations of earnings. Petitioner's failure to relate the amount of its retained earnings to specific business needs, at least to respondent's satisfaction, was obviously what led to the issuance of the deficiency notices in this case. Generally, in an "accumulated earnings" case, under existing law, two factors must be present before the "accumulated earnings" tax will be applicable. Thus, the taxpayer must have retained earnings in excess of the reasonable needs of its business. In addition, the taxpayer, during the years in question, must have been in a sufficiently liquid position to allow the distribution of a dividend (or a larger dividend than was distributed). See Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495 *115 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 362 U.S. 976 (1960), wherein the Court of Appeals stated, at 500-501: Thus, the size of the accumulated earnings and profits or surplus is not the crucial factor; rather, it is the reasonableness and nature of the surplus. Part of the surplus may be justifiably earmarked in the form of reserves, for specific, necessary business needs. Again, to the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity. * * * Where, on the other hand, the accumulation of surplus is reflected in liquid assets in excess of the immediate or reasonably foreseeable business needs of the corporation, there is a strong indication that the purpose of the accumulation is to prevent the imposition of income taxes upon dividends which would have been distributed to the shareholders. [Footnote omitted] It has been noted that a purely mechanical comparison of the total retained earnings of prior years and current profits with the reasonably anticipated needs of the business *116 is not meaningful apart from a consideration of the nature of the accumulated surplus. Cf. John P. Scripps Newspapers, 44 T.C. 453 (1965). The employment of working funds within a business to purchase a fixed asset or for any other purpose which "ties up" the funds is not an occasion for a charge against earned surplus for accounting purposes. But it does, in fact, decrease the amount of funds available for operating purposes. The question is primarily one of determining whether the taxpayer has enough liquid assets (not surplus) to meet estimated needs, including demands for working capital, plant expansion, and all reasonable contingencies. Cary, The Penalty Tax on Accumulated Earnings, Lasser Encyclopedia of Tax Procedures 816 (1956). [6]
*117 We shall, therefore, undertake to examine petitioner's earned surplus, business needs, and its actual liquidity within the foregoing frame of reference. Since petitioner did submit timely statements pursuant to section 534(c) in response to two notifications sent by respondent (the first notification with regard to petitioner's fiscal years 1957 and 1958 and the second with regard to its fiscal years 1959, 1960, and 1961), we shall, in discussing the reasonableness of petitioner's retained earnings for the taxable years in issue, point out the extent to which petitioner was successful in shifting the burden of proof to respondent with regard to the various grounds submitted by petitioner in its section 534 statements in justification of its retention of earnings. [7]
*118 Specific Needs of Petitioner's Business For Which it Accumulated Earnings 1(a) The Financing of Slow-Paying Clients We have previously found that for varying periods during each of the taxable years in issue herein there were net, past-due balances owed to petitioner by one or more of its clients. These arrearages occurred when various clients of petitioner, for one reason or another, were late in paying petitioner the amounts charged the clients (1) by the various media for advertisements placed therein or (2) by suppliers for the talent, art, or printing work used in the advertisements. These charges were billed to petitioner and it was imperative to petitioner's credit standing that they be paid on time. Thus, to the extent petitioner had not been previously paid therefor by its clients, it paid the bills with its own funds. These temporary arrearages generally averaged in excess of $1,000,000 and at some points during 1959 and 1960 were as high as $1,800,000. Because some of its clients were late in paying their bills during the years in issue, petitioner was required to invest from $1,000,000 to $1,800,000 of its working capital in the receivables of its clients. [8] This *119 Court has previously recognized that as a result of a delay in the payment of its accounts receivable an advertising agency might require additional working capital. See Belaire Management Corporation, 21 T.C. 881, 885 (1954), where The petitioner would need more operating funds as its expenditures on behalf of its sole client increased. That was because of the delay of almost a month in receiving reimbursement from its client for expenditures. * * * See also Potts-Turnbull Advertising Co., 14 B.T.A. 1321, 1334 (1929). On the basis of the facts before us, we believe that during its fiscal years 1957, 1958, and 1961 petitioner needed approximately $1,000,000 in working capital for this purpose and that during its fiscal years 1959 and 1960 it required approximately $1,800,000. (b) Burden of Proof Because the statement submitted for petitioner's fiscal years 1957 and 1958 *120 failed to convey any idea as to the amount of funds needed to finance slow-paying clients, we do not believe that under the instant circumstances the statement contained sufficient facts to shift the burden of proof to respondent under section 534. [By this we do not mean to imply that in order to shift the burden of proof in a section 534 statement it is necessary to mention either specific or even general dollar amounts in every circumstance, for we do not believe that to be absolutely necessary.] However, an examination of the evidence convinces us that petitioner carried its burden with respect to those years. The statement for petitioner's fiscal years 1959 through 1961 did contain sufficient facts to support this ground. Therefore, the burden of proof with respect thereto was on respondent. Petitioner, however, affirmatively established its needs for the amounts indicated above. 2(a) Reserve to Cover Certain "Fixed" Obligations and Commitments in the Event of Temporary Revenue Losses In seeking to justify its retention of earnings during the years in issue, petitioner pointed out a number of fixed expenses in its business such as a lease obligation of $829,000 per year *121 and several other expenses which it regarded as fixed obligations such as the annual liability for salaries to employees (other than Bates, Kearns, Reeves, and Montgelas) of over $3,700,000 per year, as well as annual contributions in excess of $600,000 to employee profit-sharing funds. Petitioner has also proffered convincing evidence concerning the risks of its business (primarily based on the fact (1) that the relationship between client and agency in the advertising business is generally quite unpredictable and (2) that more than 70 percent of its income is derived from its four largest clients). Petitioner also adduced convincing evidence concerning the desirability of having a sufficient reserve to enable it to weather the temporary loss of clients without substantially curtailing its operation. (b) Burden of Proof Although petitioner, in the two section 534 statements submitted by it, did mention those various factors, it failed to relate them, either generally or particularly, to a dollar amount. Thus, by not setting forth any idea of the extent to which funds were needed in connection therewith, under the particular circumstances of this case, it failed to apprise respondent, *122 even in a general way, of the amount of earnings it believed reasonable to accumulate for such purpose. See pages 39 and 40, supra, on this point. To this extent, petitioner did not show its hand (cf. R. Gsell & Co. v. Commissioner, 294 F. 2d 321 (C.A. 2, 1961), reversing on another ground 34 T.C. 41 (1960)), and the burden of proof on that issue remained with petitioner. However, on the basis of the record before us, we believe that petitioner has carried that burden and demonstrated (1) that during its taxable years 1957 and 1958 it was entitled to maintain a reserve of approximately $2,000,000 to enable it to continue operations in the event of the loss of a major client and (2) that during its taxable years 1959, 1960, and 1961 it was entitled to maintain a reserve of approximately $2,300,000 for such purpose. 3 No Reserves Permitted for Deductible Items Petitioner has contended that it is entitled to create reserves from its earnings to cover a number of costs incurred by it in promoting new business. These costs include amounts expended for (1) soliciting new clients, (2) marketing studies and research for new products, (3) preparation of different *123 advertisements for old clients, or (4) preparation of sample advertisements for new clients or products. Despite the fact that these costs were approximately $700,000 to $1,500,000 per year during the period in issue, they were consistently treated as expenses offsetting income and never exceeded 6 percent of operating income. In connection with a somewhat similar argument advanced by the taxpayer in Smoot Sand & Gravel Corporation v. Commissioner, supra, at 502, the Court of Appeals stated: The taxpayer is thus totally incorrect when it claims additional reserves for bad debts, because the bad debt expense has already been eliminated from surplus * * *. For the same reasons, the taxpayer's argument concerning the reserves for depreciation and depletion cannot be accepted. Surplus has already been reduced by annual charges to depreciation expense and to depletion expense; allowing them again would give the taxpayer double deductions [in his computation of "accumulated taxable income"]. Petitioner's argument that it was entitled to accumulate earnings to create a reserve for such purposes is, therefore, invalid as a matter of law. 4(a) Foreign Expansion *124 We have described with some degree of specificity in our Findings of Fact the sustained program of foreign expansion undertaken by petitioner during its fiscal years 1957 through 1964, inclusive. During that period petitioner acquired six foreign subsidiaries engaged in the advertising business at an aggregate cost of more than $5,800,000, including loans and guaranteed lines of credit extended by petitioner to the subsidiaries for working capital purposes. Respondent raises the argument that petitioner's plans for foreign expansion were not "definite and certain," except during the years it actually acquired the English and Canadian subsidiaries. It is settled as a matter of law, and has been so held by this Court and other courts upon numerous occasions, that in an "accumulated earnings" case a taxpayer's plans in connection with a proposed acquisition or program of expansion must be definite and certain before they will be considered reasonable needs of the business. See Wellman Operating Corporation, 33 T.C. 162 (1959); American Metal Products Corporation, 34 T.C. 89 (1960), *125 affd. 287 F. 2d 860 (C.A. 8, 1961); Smoot Sand & Gravel Corp. v. Commissioner, 241 F. 2d 197, 202 (C.A. 4, 1957), reversing and remanding a Memorandum Opinion of this Court; and KOMA, Inc. v. Commissioner, 189 F. 2d 390 (C.A. 10, 1951), affirming a Memorandum Opinion of this Court. See also S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 69 (1954), and section 1.537-1(b), Income Tax Regs.
Respondent, however, in his application of the terms "vague," "indefinite," and "uncertain" to petitioner's plans for foreign expansion, has either misconstrued the line of cases cited above or is applying those terms without regard to the meaning ascribed to them in the past by this Court and other courts. The cases in which taxpayers' plans have been found to be vague and indefinite are distinguishable from the facts now before us. Those cases were utterly lacking in evidence that the alleged plan or intent was accompanied by some contemporaneous course of conduct, by the corporate taxpayer therein, directed toward the claimed purpose of the retention. See KOMA, Inc. v. Commissioner, supra, at 395, *126 and Smoot Sand & Gravel Corporation v. Commissioner, 241 F. 2d, supra, at 202. See also American Metal Products Corporation, supra, wherein the taxpayer, in order to establish its alleged intent to expand, attempted to rely solely upon certain corporate minutes. This Court specifically pointed out in that case that aside from some general statements concerning expansion in the minutes, the record was barren of any evidence of actual steps being taken in connection with the alleged program of expansion. Moreover, this Court noted that the plan for expansion never materialized. See also Wellman Operating Corporation, supra, at 187-189. Petitioner's plans relating to foreign expansion were not merely an afterthought seized upon by it to justify its retention of earnings during its taxable years in issue. As we view the evidence in this case, these plans were, in fact, one of the basic factors causing petitioner to retain the major portion of its earnings during this period. See Bremerton Sun Publishing Company, 44 T.C. 566 (1965). This is not a case where petitioner's plans with regard to foreign expansion were vague, uncertain, or indefinite. *127 The record before us is replete with evidence showing specifically and clearly the steps petitioner took during the years in issue with regard to expanding abroad. Petitioner's intent during this period to expand abroad was not only evidenced by numerous informal and formal discussions among the members of petitioner's management, but it was also manifested by concrete and definite action on the part of petitioner and its officers. By the start of its fiscal year 1956, a number of competitive pressures had caused petitioner to make clear plans and take definite steps toward expanding its operations first into England and then into Canada. First, as early as fiscal 1956, one of petitioner's newer, more important clients suggested that petitioner expand its operations into Great Britain, and further suggested that petitioner might do this by acquiring the British advertising agency used by that client. Moreover, there was indirect competitive pressure exerted upon petitioner to expand abroad, particularly into Canada. One of petitioner's largest clients conducted a substantial amount of business in Canada. In addition, a large number of United States businesses, including several of *128 petitioner's clients, had substantially increased their activities abroad. As a result of this, a number of petitioner's competitors among the 10 or 15 largest advertising agencies had, in one way or another, begun to operate abroad. Therefore, petitioner's management by 1956 believed that if it were merely to retain its own clients, let alone prosper and grow, it had to expand abroad. From that point on, as far as petitioner was concerned, it was merely a matter of: (1) obtaining the funds with which to do so; (2) finding a suitable time, place, and agency; and (3) employing the proper degree of solicitation, coaxing, cajoling, and "horse trading." It hardly seems necessary to mention that the purchase of a business like an advertising agency is not like the routine purchase of an automobile. Such businesses are not fungible. Thus, a careful review of the evidence before us, especially the testimony of Bates, Reeves, and Kearns, convinces us that prior to the expiration of its fiscal year 1957, petitioner had committed itself to the acquisition of established advertising agencies in England and Canada. We are also convinced that petitioner's management had very definite views with *129 respect to the type of agency it wished to acquire in each of those countries. Shortly prior to the close of fiscal 1957, the top echelon of petitioner's management discussed the price at which they thought petitioner might be able to acquire a particular British agency which seemed suitable. The estimated cost, $1,500,000, was extremely close to the amount petitioner ultimately invested in the John Hobson and Partners, Ltd., agency in July 1959. It is our opinion that for its fiscal years 1957 and 1958 petitioner had business needs of, and was clearly entitled to create a reserve equivalent to, $1,500,000 to cover its plans for expansion into Great Britain. Although its plans for expansion into England were given priority, petitioner's efforts to establish itself in Canada did not lag by much. During the latter part of 1958 (petitioner's fiscal year 1959) petitioner authorized one of its senior vicepresidents "to explore specific possibilities for expansion into Canada." On the basis of the evidence before us, including the clear-cut course petitioner pursued in acquiring a Canadian subsidiary, we believe that petitioner during its fiscal year 1959 was justified in retaining $700,000 *130 of its earnings to create a reserve for the acquisition of a Canadian subsidiary. As of the close of fiscal 1959, petitioner in our opinion was justified in maintaining reserves of $2,200,000 for purposes of foreign expansion (which sum includes $1,500,000 set aside in 1957 and 1958 for expansion into Great Britain). During its fiscal year 1960, petitioner's efforts to acquire an English subsidiary came to fruition, as the closing in connection with petitioner's purchase of John Hobson and Partners, Ltd., was held on July 7, 1959. In addition to the actual sales price of $1,019,000, petitioner, in order to provide adequate working capital for the Hobson agency, pledged $650,000 in short-term securities with a bank in order to guarantee a line of credit to its new English subsidiary. Thus, with this acquisition, more than $1,669,000 of liquid assets were converted into a fixed asset. During its fiscal year 1960, petitioner's efforts to acquire a Canadian advertising agency also met with success. Petitioner entered into the final stages of negotiation with the Spitzer & Mills, Ltd., agency during May 1959. In January of that year a price of $850,000 (with $700,000 to be paid at the *131 closing and $150,000 to be paid in three annual installments) was agreed upon between petitioner and Spitzer & Mills, Ltd., for the purchase of the Canadian agency. The actual closing for this purchase was held on September 20, 1960. In our opinion, because of the course that its negotiations to acquire a Canadian subsidiary took during fiscal 1960, petitioner was justified during that year in retaining an additional $200,000 of earnings to add to its reserve to cover the acquisition of a Canadian subsidiary. Thus, as of March 31, 1960, it was justified in maintaining a total reserve of $900,000 for purposes of expansion into Canada. During its fiscal year 1961, petitioner, in connection with the actual purchase of the Spitzer & Mills agency, converted some $721,437.50 of liquid assets into a fixed investment. We believe that petitioner, during that year, was also justified in maintaining a reserve of approximately $150,000 to cover the three remaining payments to be made in connection with its purchase of the Canadian agency. Petitioner, on October 28, 1960, loaned $200,000 to its new Canadian subsidiary in order to provide it with sufficient working capital. In our opinion, *132 petitioner, at least during fiscal 1961, was entitled to treat this loan as a fixed investment. On December 30, 1960, petitioner paid an additional $36,678.67 pursuant to the purchase contract. Thus, during that year petitioner had $1,118,611.80 of its earned surplus "tied up" in Spitzer & Mills, Ltd.
During fiscal 1961, petitioner had invested approximately $1,685,233.73 of its earned surplus in its English subsidiary. Petitioner began negotiations concerning the acquisition of a French advertising agency in the spring of 1959. Because of certain "internal" problems that petitioner found in the French agency and because of numerous thorny questions of foreign law, it took petitioner approximately 2 1/2 years to acquire the French agency. Finally, petitioner on November 30, 1961, through a Swiss subsidiary it had created for the purpose, acquired l'Agence Francaise de Propagande at a cost of $666,955. As we view the evidence before us, we believe petitioner was justified, during its fiscal year 1961, in maintaining a reserve of $700,000 for purposes of acquiring a French advertising agency. Respondent argues that the net amounts petitioner required to purchase the above foreign *133 subsidiaries should be reduced by the amounts petitioner received upon the sale of its stock to certain executives of the foreign subsidiaries acquired by it. This argument is groundless; for there is no evidence in the record that petitioner was assured of selling its stock to those persons as part of the purchase transaction, or any real evidence that petitioner ever contemplated so doing. Thus, in estimating its reasonable business needs for foreign expansion, petitioner was not required to reduce the amounts it anticipated were necessary to effect the purchases of foreign agencies by the amounts it ultimately received upon the sale of small percentages of its stock to various personnel of the acquired agencies. (b) Burden of Proof We have reached the foregoing conclusions regarding petitioner's needs for foreign expansion on the basis of a study of the entire record and without reliance upon the burden of proof. Had resort to the burden of proof been necessary, we would have ruled that the burden has shifted to respondent. Having analyzed petitioner's section 534 statements with respect to its fiscal years 1957 and 1958 and with respect to its fiscal years 1959 through 1961, *134 we believe that they have set forth sufficient facts relating to petitioner's plans and needs for foreign expansion for those years. 5(a) Petitioner's Use of Accumulated Earnings to Repurchase Stock from Employees Between April 1, 1956, and March 31, 1961, petitioner made sales of stock to its employees totaling $617,266 and repurchased stock from employees aggregating $2,199,496.50. During this period, the largest single repurchase of stock occurred in March 1960, when petitioner redeemed 20,000 shares of its Class A common stock from Ted Bates for approximately $1,800,000. Petitioner at no time contended, nor have we found anything in the record to make us believe, that it ever accumulated any of its earnings for that purpose. [9] Petitioner advances two arguments with respect to its redemption of Bates' stock. First, petitioner contends that the portion of the redemption proceeds paid to Bates, properly chargeable to its earnings and profits account ($1,700,000), exceeded its "earnings" for fiscal 1960 and that, therefore, petitioner did not accumulate any earnings and profits that year. Petitioner's second argument is (1) that, in effecting the redemption it used earnings previously *135 accumulated by it for other valid business purposes, (2) that the redemption itself was effected essentially for corporate purposes, namely, to assure petitioner the continued services of its key executives other than Bates, and (3) that the earnings so used did not represent an unreasonable accumulation of surplus. *136 Petitioner's first argument is incorrect as a matter of law. It fails to recognize the difference between earnings and profits for a given year (see section 312) and accumulated taxable income (see section 535). The term "accumulated taxable income" means a corporation's taxable income minus certain adjustments (such as Federal taxes paid, section 535(b)), minus the dividends paid deduction provided in section 561, and minus the accumulated earnings credit for that portion of its earnings which was accumulated to meet the reasonable needs of its business. Petitioner apparently bases its argument that no earnings were accumulated during fiscal 1960 upon the fact that during that year it had taxable income in the amount of $4,369,471.68, paid Federal taxes of approximately $2,267,000, and paid an aggregate total of $1,924,580 to Bates and certain other stockholders in redemption of their stock, leaving a net accumulation of approximately $175,000. However, an examination of the applicable statutory provisions indicates that the distributions made by petitioner during fiscal 1960 do not qualify for the dividends paid deduction provided for in section 561, [10] sinc ethe distributions *137 were not pro rata within the meaning of section 562(c) but constituted preferential dividends. *138 Thus, we must consider the second argument made by petitioner with regard to its redemption of Bates' stock. Respondent's principal argument, in so far as petitioner's repurchases of its stock are concerned, is that its redemption of 20,000 shares of Class A common stock from Bates in March 1960 for $1,800,400 was motivated by reasons personal to Bates, rather than by valid business reasons. Although respondent has failed to carry this argument through to its logical conclusion, evidently it is his point that petitioner's use of a portion of its previously accumulated earnings for the personal benefit of its controlling shareholder indicates that, to the extent of the monies so expended, the grounds for accumulation alleged by petitioner were bogus. [11]
*139 This is not a case where petitioner was Bates' alter ego. It is true that prior to the redemption Bates, together with his wife, owned stock giving him 52 percent voting control in petitioner. However, there did exist a significant minority group of stockholders whose interests were not identical to those of Bates and were in a number of respects adverse to Bates' own personal interests. Under these circumstances, we believe that it is possible to distinguish between "shareholder purposes" as opposed to "corporate purposes." In this respect, the instant case differs from Pelton Steel Casting Co., 28 T.C. 153 (1957), affd. 251 F. 2d 278 (C.A. 7, 1958), certiorari denied 356 U.S. 958 (1958). Also cf. Lewis v. Commissioner, 176 F. 2d 646, 650 (C.A. 1, 1949), affirming 10 T.C. 1080 (1948). We therefore believe that such an examination would be helpful in connection with the resolution of this issue. There have been a number of cases where courts, on the basis of the particular facts before them, have held stock redemptions to have been made in order to serve legitimate corporate purposes, rather than for reasons *140 personal to the shareholders. See Dill Manufacturing Co., 39 B.T.A. 1023 (1939), and Gazette Pub. Co. v. Self, 103 F. Supp. 779 (D.C.E.D. Ark., 1952). See also Mountain State Steel Foundaries, Inc. v. Commissioner, 284 F. 2d 737, 745[12] (C.A. 4, 1960), reversing a Memorandum Opinion of this Court. It is also true that a number of courts, in considering this issue, have concluded that the redemption was motivated by reasons personal to the shareholders and that such fact indicated that earnings had been unreasonably accumulated. Pelton Steel Casting Co., supra; KOMA, Inc. v. Commissioner, supra. In our opinion, each of the foregoing cases has been decided on the basis of the specific facts therein. We do not believe that there is any "hard and fast" rule that a stock redemption per se indicates that a corporate taxpayer has unreasonably accumulated earnings. The fact of the stock redemption is merely *141 one factor to be considered and weighed together with all the other facts of the case. We have previously considered the reasons petitioner contends caused it to accumulate its earnings during the years in issue. To the extent hereinabove indicated, we have found that those reasons constituted reasonable business needs for which petitioner was justified in accumulating a portion of its earnings. A careful review of the evidence also indicates that sound business reasons, rather than Bates' personal motives, caused petitioner to use a portion of its earnings, accumulated for the various purposes hereinbefore noted, in order to redeem a portion of Bates' stock during March 1960. Those business reasons were described as follows in a ruling request submitted to respondent by petitioner in connection with the aforesaid redemption: It is apparent [from certain facts described in the ruling request] that Mr. Bates is the controlling stockholder of [petitioner]. The success of [petitioner] in the advertising agency business has been attributable largely to the efforts of Mr. Bates; however, with the expansion of the business certain key employees, namely: Mr. Reeves, Chairman of *142 the Board, Mr. Kearns, Vice-Chairman of the Board and Mr. Montgelas, President of [petitioner], have assumed an increasing share of "top management" responsibility in [petitioner]. In view of the circumstances of [petitioner's] business, the continued services and loyalty of Messrs. Reeves, Kearns and Montgelas are essential to its successful operation and growth. To retain and encourage these employees, it has become necessary to increase their ownership interest in the business and for each of them to have a greater voice in the policy determinations and control of the business. Due to the limited finances of these individuals, the increase in ownership can only be accomplished by a reduction of the stock interest and voting control of Mr. Bates coupled with the acquisition of the Class B stock by Messrs. Reeves, Kearns and Montgelas. Respondent ruled that the repurchase of Bates' stock would constitute a substantially disproportionate redemption pursuant to section 302(b)(2). In connection with the redemption of the 20,000 shares of Class A common stock, Bates sold to each of Reeves, Kearns, and Montgelas 37,500 shares of his Class B common stock at a price of $0.10 *143 per share. The following schedule illustrates the voting control and stock ownership in petitioner immediately prior to and subsequent to these transactions: Stockholdings Prior to
Stockholdings
Subsequent to
the Redemption
the Redemption
Percent
Percent
of
of
Voting
Voting
Shareholder
Class A
Class B
Control
Class A
Class B
Control
Bates
30,000
150,000
70.2
10,000
37,500
20.1
Bates' wife
5,000
1.9
5,000
2.1
Reeves
10,000
3.9
10,000
37,500
20.1
Kearns
10,000
3.9
10,000
37,500
20.1
[1] Montgelas 3,500
1.4
3,500
37,500
17.3
Other Employees
48,050
18.7
48,050
20.3
Totals
106,550
150,000
100.0
86,550
150,000
100.0
There is no evidence in the record that personal considerations of Bates led to the redemption of 50.1 percent of his stock. Thus, there is no evidence to indicate that he was in need of funds during the period in issue. The only evidence is to the effect that Bates, personally, was not too pleased at *144 the prospect of reducing his interest in petitioner, but agreed to do so because it was in the best interests of petitioner. The redemption of Bates' stock served to assure the continuity of petitioner's management which, under the circumstances before us, we believe is a valid corporate purpose. Cf. United States v. Anderson, Clayton & Co., 350 U.S. 55 (1955). The instant case is distinguishable from the Pelton Steel Casting Co. case because in that case the corporation was, in effect, the alter ego of the selling shareholders who owned 80 percent of the corporation's stock. The redemption was effected to accommodate those shareholders who wished to terminate their relationship therein. (b) Burden of Proof Petitioner, in its section 534 statement submitted with respect to its fiscal year 1960, clearly indicated that the main purpose of the redemption of Bates' stock during 1960 was to retain the continued services of three of petitioner's "top" executives. Since the statement submitted by petitioner with regard to this redemption "showed petitioner's hand," petitioner was successful in shifting the burden of proof on this issue to respondent. Conclusion
*145 Respondent, both at the trial and on brief, repeatedly emphasized the fact that, during the years in issue, petitioner was in an extremely liquid position. However, there is no provision in the Internal Revenue Code of 1954, or any prior Code for that matter, which prohibits large cash balances where a taxpayer has a sufficient need for the cash in its business. In the course of our opinion, we have made determinations with regard to the needs of petitioner's business during the taxable years in issue and the specific amounts of earnings petitioner was justified in retaining during each such year. The following schedule reflects the amounts of earnings needed in petitioner's business during the years in issue. Petitioner's Reasonable Business Needs during its Taxable Years
1957 through 1961, as hereinabove Determined
Business Needs
1957
1958
Funds to finance slow-paying
$1,000,000
$1,000,000
clients
Reserve for certain fixed expenses
2,000,000
2,000,000
in the event of loss of a major
client
Foreign expansion
1,500,000
1,500,000
$4,500,000
$4,500,000
Petitioner's Retained Earnings Account During its Taxable Years
1957 through 1961
$3,079,685.52
$5,182,059.39
*146 Petitioner's Reasonable Business Needs during its Taxable Years
1957 through 1961, as hereinabove Determined
Business Needs
1959
1960
1961
Funds to finance slow-paying
$1,800,000
$1,800,000
$1,000,000
clients
Reserve for certain fixed expenses
2,300,000
2,300,000
2,300,000
in the event of loss of a major
client
Foreign expansion
2,200,000
2,570,000
3,500,000
$6,300,000
$6,670,000
$6,800,000
Petitioner's Retained Earnings Account During its Taxable Years
1957 through 1961
$6,750,599.94
$6,636,630.42
$7,714,326.23
Reference to the foregoing table indicates that in three of the five taxable years in issue petitioner's accumulated earnings did exceed the reasonable needs of its business as determined by this Court. Thus, in petitioner's taxable year 1958, this excess totaled approximately $680,000, in 1959 the excess was approximately $450,000, and in 1961 the excess was approximately $918,000. Having determined that petitioner's accumulated earnings exceeded its reasonable business needs for its taxable years 1958, 1959, and 1961, we now direct our attention to the amount of liquid assets available to meet its business *147 needs during those years. We have previously found that during its taxable years 1958, 1959, and 1961, petitioner's current assets exceeded its current liabilities by the following amounts, respectively: $4,771,418.96, $6,507,312.32, and $5,075,948.74. As of the end of its taxable years 1958 and 1959, no portion of petitioner's business needs had been converted into a fixed asset since petitioner had not yet acquired the Hobson agency. Thus, the amount of petitioner's business needs which were required to be covered or financed by its net current assets remained at approximately $4,500,000 in 1958 and $6,300,000 in 1959. Petitioner therefore had sufficient liquid assets in excess of its business needs to enable it to pay a dividend of approximately $271,000 in 1958 and approximately $200,000 in 1959. These facts are determinative of the proscribed purpose to avoid the income tax with respect to its shareholders unless petitioner shall prove to the contrary by a preponderance of the evidence. Section 533. Petitioner has failed to meet its burden of proof on this ultimate issue with respect to the years 1958 and 1959. As of the end of its taxable year 1961, approximately $2,653,845.53 *148 * of the reasonable needs of petitioner's business had been converted into a fixed asset, namely, its investment in John Hobson and Partners, Ltd., and its investment in Spitzer & Mills, Ltd. (including advances, loans, and guarantees). The amounts of petitioner's reasonable business needs for its taxable year 1961 which were required to be covered or financed by its net current assets were reduced to approximately $4,146,154.47 ** ($6,800,000 less $2,653,845.53 +). Accordingly, petitioner had net liquid assets of more than $920,000 ++ in excess of what was reasonably required in its business. Petitioner has failed to establish that it was unable to distribute additional dividends totaling approximately $914,000 during its taxable year ended March 31, 1961. To the extent of its accumulated earnings during its fiscal year 1961, petitioner was unable to establish that it was not availed of for the purpose of avoiding the income tax with respect to its shareholders by accumulating approximately $914,000 in earnings that were not required for the reasonable needs of its business. *149 Petitioner is entitled to a credit under section 535(c)(1) for each of the taxable years before us equal to the amount of earnings and profits which have been retained for the reasonable needs of the business. Decisions will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended. ↩
2. The other issues raised in the pleadings have been settled by two memoranda of agreement between petitioner and respondent.↩
1. Montgelas held options on 6,500 shares of Class A stock which he exercised on August 8, 1963.↩
2. The percentage of voting power does not include outstanding and unexercised stock options. ↩
1. Class A and B common stocks equal voting rights. ↩
3. Montgelas held options to purchase 6,500 shares of Class A stock which he exercised on August 8, 1963.↩
1. These securities were, in general, held for the purpose of satisfying short-term liabilities, such as taxes and various other commitments. For the taxable period beginning April 1, 1956, through March 31, 1961, the funds generated by petitioner's business were as follows: ↩
Aggregate taxable income (Per
$20,655,424.44
income tax returns)
Less Federal income tax
10,710,322.60
$ 9,945,101.84
Plus depreciation and
612,530.02
amortization claimed on income
tax returns
Total
$10,557,631.86
Plus proceeds actually received
617,266.00
from sale of stock
$11,174,897.86
Less amounts used to repurchase
2,199,496.50
stocks from employees
Total funds available to
$8,975,401.36
business
Dividends paid
$ 1,611,925.00
Additions to Fixed Assets
1,201,611.43
Foreign Investments (England and
2,653,841.53
Canada)
5,467,377.96
$3,508,023.40
3. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27 1/2 percent of the accumulated taxable income not in excess of $100,000, plus (2) 38 1/2 percent of the accumulated taxable income in excess of $100,000. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. * * *
SEC. 537. REASONABLE NEEDS OF THE BUSINESS. For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. ↩
4. In general, "accumulated taxable income" means taxable income for the year in question, (1) minus certain adjustments (such as, for example, the Federal income taxes due thereon, the excess of actual charitable contributions over the amount allowed as an income tax deduction), (2) minus any dividends paid during the taxable year, and (3) minus the accumulated earnings credit. See section 535↩. 5. Pursuant to section 537↩, the term "reasonable needs of the business" is defined to include "the reasonably anticipated needs of the business."
6. Instead of specifically discussing its business needs on a year-by-year basis and pinpointing the amounts of earnings retained by it to meet those needs, petitioner has painted with a broad stroke the needs confronting its business during the five taxable years in issue and has attempted to convince this Court that the earnings retained by it during this period were retained to meet those needs. It is true that petitioner's management had taken a rather informal approach with regard to articulating or describing the business needs which caused it to embark upon a policy of retaining a major portion of its earnings during the years in issue. However, it is also true that: It is not necessary for a corporation to create surplus reserves on its books to cover its future business needs, * * *. The Statute imposes no such evidentiary requirement, nor is the mere book entry conclusive, in a Section [531] case, that the reserve is for a reasonably anticipated business need. * * * [Smoot Sand & Gravel Corp. v. Commissioner,], 241 F. 2d 197, 207 (C.A. 4, 1957), reversing and remanding a Memorandum Opinion of this Court. Despite the generality of petitioner's approach, this Court has found persuasive evidence concerning the specific amounts retained by petitioner during each of its taxable years in issue to meet the reasonable needs of its business.↩
7. SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary. - Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. In the case of a notice of deficiency to which subsection (e)(2) applies and which is mailed on or before the 30th day after the date of the enactment of this sentence, the notification referred to in the preceding sentence may be mailed at any time on or before such 30th day. (c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. * * *↩
8. Although some of petitioner's clients may have paid their bills early, we have found that the amounts of working capital used to finance slow-paying clients represented net arrearages even taking into consideration the funds available because of early payment of bills.↩
9. In the section 534 statement submitted by petitioner for its fiscal years 1959 through 1961, and at the trial, petitioner did contend that it was entitled to accumulate a portion of its earnings to create a reserve to cover its obligation to redeem the stock of employee-stockholders upon the happening of certain contingencies such as their death, retirement, or resignation. It is clear that, under appropriate circumstances, the retention of earnings to create a reserve to fund a corporate obligation to redeem or repurchase some of its stock may constitute a reasonable business need. Cf. Emeloid Co. v. Commissioner, 189 F. 2d 230, 233 (C.A. 3, 1951), reversing 14 T.C. 1295 (1950); and Mountain State Steel Foundries, Inc. v. Commissioner, 284 F. 2d 737 (C.A. 4, 1960), reversing a Memorandum Opinion of this Court. However, a review of the facts before us indicates that the amounts petitioner received in connection with the sale of its stock to employees exceeded the aggregate amount petitioner became obligated to pay, pursuant to the terms of its stock option agreement, in the repurchase of stock from its employees in the event of their death, resignation, or retirement. This is also true even when the $1,800,400 expended by petitioner in the redemption of 20,000 shares of Class A common stock from Ted Bates is included in the amount petitioner became obligated to pay in connection with the redemption or repurchase of its stock from employees. Therefore, it would appear that petitioner was not, during any of its taxable years in issue, required to accumulate any of its earnings to provide a fund for redemption of stock.↩
10. SEC. 561. DEFINITION OF DEDUCTION FOR DIVIDENDS PAID. (a) General Rule. - The deduction for dividends paid shall be the sum of - (1) the dividends paid during the taxable year, * * *
(b) Special Rules Applicable. - In determining the deduction for dividends paid, the rules provided in section 562 (relating to rules applicable in determining dividends eligible for dividends paid deduction) and section 563 (relating to dividends paid after the close of the taxable year) shall be applicable. SEC. 562. RULES APPLICABLE IN DETERMINING DIVIDENDS ELIGIBLE FOR DIVIDENDS PAID DEDUCTION. (a) General Rule. - For purposes of this part, the term "dividend" shall, except as otherwise provided in this section, include only dividends described in section 316 (relating to definition of dividends for purposes of corporate distributions). * * *
(c) Preferential Dividends. - The amount of any distribution shall not be considered as a dividend for purposes of computing the dividends paid deduction, unless such distribution is pro rata, with no preference to any share of stock as compared with other shares of the same class, and with no preference to one class of stock as compared with another class except to the extent that the former is entitled (without reference to waivers of their rights by shareholders) to such preference. * * *↩
11. Cf. Altman, "Corporate Accumulation of Earnings," 36 Taxes 933, 947 (1958). Therein it was noted: The use of accumulated funds to redeem where no positive value to the corporate entity can be shown may support an inference that the forbidden tax-avoidance purpose motivated the accumulation in years prior to the year of redemption, just as does such evidence as loans to [controlling] stockholders or sales to the corporation at inflated prices by [controlling] stockholders. On the other hand, where the redemption can be shown to serve a corporate business purpose, or be of benefit to the corporation, such as protecting against threat to management, avoiding harm to the business from competitors of genuinely protecting the continued existence of the business, the redemption would be a fact from which no adverse inference should be drawn. * * *↩
12. This Court has also reached this conclusion in several Memorandum Opinions, such as Fred F. Fischer, Memorandum Opinion of Court, dated May 8, 1947, and Penn Needle Art Co., T.C. Memo. 1958-99↩.
1. Montgelas held a stock option for 6,500 shares of Class A common stock which he exercised on August 8, 1963.↩
*. By official order of the Tax Court, dated 12/3/65, this figure was substituted for $2,803,845.53. ↩
**. By official order of the Tax Court, dated 12/3/65, this figure was substituted for $3,996,154.47. ↩
+. By official order of the Tax Court, dated 12/3/65, this figure was substituted for $2,803,845.53. ↩
++. By official order of the Tax Court, dated 12/3/65, this figure was substituted for $1,000,000.↩